RECEIVED
SEP - 6 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| GEORGIANA WALKER | * | CIVIL ACTION NO. 04-2150 |
| VERSUS | * | JUDGE MELANÇON |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Georgiana Walker, born September 11, 1949, filed an application for disability insurance benefits on January 3, 2002, alleging disability as of October 16, 2001, due to herniated disc surgery, radiculopathy, cervical spondylosis, and osteoporosis.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of F.R.Civ.P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Records from Dr. M. J. Jolivette dated July 1, 2001 to December 10, 2001.** On July 31, 2001, claimant was seen for monoarthritis to her left knee. (Tr. 181). Dr. Jolivette injected the joint with Celestone and prescribed Vioxx.

On September 5, claimant reported that she had been seen in the emergency room over the weekend with some numbness and swelling of her left arm. (Tr. 180). She had a venous NIVA, which was unremarkable. She had an area of point tenderness along the lateral aspect of her cervical spine, which Dr. Jolivette suspected was caused by a cervical radiculopathy. He gave her an injection and referred her for physical therapy. (Tr. 177-78).

An MRI dated October 16 showed a diffuse annular disc bulge at C3-4 with mild central spinal stenosis and a large central disc herniation at C6-7. (Tr. 175-76). Dr. Jolivette referred her to a neurosurgeon. (Tr. 174).

**(2) Records from Dr. Luiz deAraujo dated October 31, 2001 to January 14, 2002.** Claimant complained of neck pain radiating to the left upper extremity and to the interscapular region. (Tr. 187). On examination, she had mild weakness of the left biceps, mildly weak wrist extensors, decreased sensation to pin prick in the 7th cervical dermatome, very weak deep tendon reflexes of the left upper extremity, severe spasm of the paravertebral cervical muscles, and very limited range of motion of the neck due to pain. (Tr. 188). Dr. deAraujo recommended a cervical myelogram

and CAT scan, which showed bilateral foraminal stenosis at C5-6 as well as a rather large central and left-sided disc herniation at C6-7 on the left. (Tr. 186). Claimant also had spondylotic changes at C4-5, but no compression of the nerve roots. Dr. deAraujo recommended surgery.

On November 20, 2001, Dr. deAraujo performed foraminotomies at C5-6 and C6-7 on the left side, and a microdiskectomy at C6-7 on the left side. (Tr. 134). Post-surgery, claimant was doing very well, but still had some residual stiffness in her neck. (Tr. 184). Dr. deAraujo recommended physical therapy.

On January 9, 2002, claimant was responding well to physical therapy. (Tr. 183). Her left upper extremity strength had significantly improved, and her tightness of the paravertebral cervical muscles and trapezius, as well as range of motion of the neck, had also improved. However, she complained of low back pain radiating to the left lower extremity. Dr. deAraujo advised her to continue physical therapy.

An MRI dated January 14, 2002 revealed no diagnostic abnormality. (Tr. 279).

**(3) Records from Industrial & Hand Rehab Center dated October 31, 2001 to February 11, 2002.**[1] On February 11, 2002, Karen LaGrange, L.P.T., O.T.R., reported that claimant's progress during the last two weeks had remained guarded.

---

[1] Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(e) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

3

(Tr. 191, 268-70). She still complained of a development of numbness in the left upper extremity below the elbow region, and also had experienced pain in the low back. Range of motion of the cervical region had shown good improvement.

**(4) Residual Functional Capacity ("RFC") Assessment (Physical) dated April 8, 2002.** Dr. Douglas Whitehead determined that claimant could lift 20 pounds occasionally and 10 pounds frequently. (Tr. 227). She could stand, walk and sit about 6 hours in an 8-hour workday. She had unlimited push/pull ability.

Claimant could climb ramps and stairs occasionally, but never ladders, ropes or scaffolds. (Tr. 228). She could occasionally balance, stoop, kneel, crouch and crawl. Dr. Whitehead noted that she might have difficulty performing overhead work, but otherwise, her ability to perform fine and gross manipulation would not be compromised. While her impairment would produce the symptoms, her physical findings indicated that her condition had continued to improve and would not limit her ability to perform all substantial gainful activity. (Tr. 231).

**(5) Records from Dr. deAraujo dated February 11, 2002 to July 29, 2002.** On February 11, claimant stated that her neck was doing well, but she was having excruciating pain in her left temporoparietal region. (Tr. 240). An MRI of the brain was normal. (Tr. 239). On February 15, claimant reported that she had improved, but still had pain in her left forearm. He advised her to see Dr. Lindemann, who was a

4

specialist in physical medicine and rehabilitation.

On March 18, claimant reported that she had been doing very well under Dr. Lindemann, but that her neck pain had become worse after physical therapy. (Tr. 238). Neurological examination was normal, except for some tightening of the paravertebral cervical muscles. On April 17, Dr. deAraujo reported that claimant was doing very well and responding to physical therapy. (Tr. 237).

On June 19, claimant was doing well as far as her upper extremities, but complained of pain in the interscapular region. (Tr. 236). She had a small trigger point for pain there. Her neurologic examination was normal as to sensation, strength, and reflexes of the upper extremities. She had no detectable spasm. Dr. deAraujo discharged her from his care, and advised her to continue seeing Dr. Lindemann.

On July 29, 2002, claimant was doing well as to her neck, but complained of persistent episodes of low back pain. (Tr. 235). She had a normal neurological examination. Her main complaint was left knee swelling. Dr. DeAraujo recommended an MRI scan of the left knee and stated that he would re-evaluate her on an as-needed basis.

**(6) Records from Dr. Wayne T. Lindemann dated February 20, 2002 to April 2, 2003.** On February 20, 2002, claimant complained of numbness and

heaviness to the left arm and weakness to the left hand. (Tr. 247). On examination, she was 5 feet 3 inches tall and weighed 165 pounds. (Tr. 248). Her speech was fluent, motor was 5/5, sensation was decreased over the proximal forearm, reflexes were symmetrical, and coordination was good.

Dr. Lindemann's impression was probable left elbow epicondylitis. He prescribed Relafen, Neurontin, and physical therapy. (Tr. 248-49).

On March 13, Dr. Lindemann noted that claimant had had excellent results from physical therapy. (Tr. 246). However, she still complained of numbness localized to the left forearm area and pain over the left extensor carpi radialis brevis musculature. The impression was cervical decompression, left lateral epicondylitis, and numbness of the left forearm, etiology uncertain. She was instructed to continue physical therapy and medications.

On April 24, Dr. Lindemann reported that electrodiagnostic testing had revealed a mild left carpal tunnel syndrome. (Tr. 245, 278). Claimant still had some numbness to the left forearm area. She was able to rotate at the cervical spine to the right without difficulty, but with pain to the left. She moved all extremities well. Dr. Lindemann recommended that claimant continue medications and wearing the resting hand splint at night.

6

On October 21, Dr. Lindemann reported that claimant had been wearing a left wrist splint at night, which had helped to relieve most of her left carpal tunnel syndrome. (Tr. 243). On examination, she ambulated without any assistance or assistive devices. Her left arm had no evidence of focal numbness, weakness, or swelling. Her range of motion was pain free, and motor and sensation were intact.

Dr. Lindemann opined that claimant was at maximum medical improvement. He stated that she could continue to wear the splint and would remain on her current medications. He approved her for sedentary duty only, avoiding overhead activity.

On April 2, 2003, claimant continued with pain localized to the neck with radiation down the left upper extremity, and giveaway weakness at the left arm. (Tr. 241). She was able to drive and dress independently, but was limited with any prolonged activity due to pain.

On examination, claimant's speech was fluent. Her left grip was weaker than the right. She had no sensory deficits. Reflexes remained symmetrical. She was able to ambulate unassisted. Range of motion of the cervical spine was limited to 75%.

Dr. Lindemann's impression was cervical decompression at C5-6, C6-7, a history of left carpal tunnel syndrome, high blood pressure, diabetes mellitus, osteoarthritis and thyroid trouble. He increased her Neurontin to three times a day, and placed her on Zanaflex at night. He also prescribed Darvocet and Skelaxin.

Dr. Lindemann changed claimant's work status to "permanently disabled due to her intractable pain with a history of posterior cervical decompression." (Tr. 242). He determined that she was at maximum medical improvement from a worker's compensation standpoint.

**(7) Records from Dr. M. J. Jolivette dated January 30, 2002 to May 7, 2003.** On January 30, 2002, Dr. Jolivette stated that claimant still had a lot of muscle pain involving the cervical muscle groups extending from the left shoulder to the base of her skull. (Tr. 272). She also complained of tenderness to the left TMJ joint which caused some earache pain, tenderness to palpation of the biceps tendon, and tenderness to palpation over the brachioradialis muscle which caused left arm weakness. He increased her Zanaflex and prescribed a Medrol Dosepack, more physical therapy, and Mobic.

On April 25, claimant continued to have left ear pain, which Dr. Jolivette determined was from her TMJ joint. (Tr. 261). She also had a sensitivity near the occiput of her skull, which appeared to be a neuralgia-like problem that he injected with Celestone. He stated that it appeared that she was doing well with physical therapy, and that her blood pressure was under good control. He also noted that a thyroid goiter and her blood sugar were also being followed.

On July 12, claimant was doing well in general. (Tr. 258).

In a Medical Source Statement of Ability to do Work-Related Activities (Physical), Dr. Jolivette determined that claimant could occasionally lift/carry less than 10 pounds. (Tr. 250). Standing/walking were not affected by her impairment. She could sit for less than 6 hours in an 8-hour workday. (Tr. 251). Pushing/pulling were limited in her upper extremities due to cervical radiculopathy with cervical disc disease and neuropathic pain. She could never climb, balance, kneel, crouch, crawl or stoop because any position change aggravated her neck and arm pain.

Dr. Jolivette determined that claimant was limited as to reaching, handling, fingering, and feeling. (Tr. 252). She could occasionally reach, handle, finger, and feel, but he suggested that she not do any of these activities. She also had environmental limitations, because any uncomfortable stimulus aggravated her underlying neuropathic pain. (Tr. 253).

**(8) Claimant's Administrative Hearing Testimony.** At the hearing on June 10, 2003, claimant was 53 years old. (Tr. 36). She had worked at Fruit of the Loom sewing for 25 years. (Tr. 37-38). She testified that she had last worked on October 15, 2001 when she had cervical disk repair. (Tr. 36-37).

Claimant reported that the surgery had not helped her condition, because her left arm went numb, her left knee went out, and her back pain was worse. (Tr. 37). She testified that she was supposed to have lumbar disc surgery. Additionally, she

complained of finger problems, hip pain, thyroid problems, high blood pressure, and diabetes. (Tr. 39, 42).

Claimant testified that she took medications for her pain, blood pressure, and thyroid disease. (Tr. 39, 42, 45). She stated that the pain medications helped, but made her drowsy and caused stomach problems and headaches. (Tr. 40).

Regarding activities, claimant testified that she did not do any housework, cooking, or shopping. (Tr. 40, 44). She reported that she went to church about twice a month. (Tr. 41). She said that her family visited her occasionally. She drove a car about once a month.

As to restrictions, claimant testified that she could stand for about 15 minutes. (Tr. 43). She stated that she fell about three or four times a week. She complained that she could not sit for long, because her back would start hurting.

Additionally, claimant reported that she could not even carry 10 pounds because she had carpal tunnel syndrome in her right arm. (Tr. 44). She also could not do buttons or zippers on her clothes. She did not climb, push, pull, or squat. (Tr. 45).

**(9) Administrative Hearing Testimony of Lionel Bordelon, Vocational Expert ("VE").** In the first hypothetical, the ALJ asked Mr. Bordelon to assume a claimant of the same age, education and work experience; who had the residual functional capacity to perform light work that did not require climbing ladders, ropes,

or scaffolds; required only occasional balancing, stooping, kneeling, crouching, and crawling; did not require working overhead, and did not require constant reaching, fingering, and handling with the left arm. (Tr. 48). In response, the VE identified the jobs of weigher, measurer or checker, particularly in the checker position, of which there were 72,321 positions nationally and 997 statewide. (Tr. 49-50). He stated that approximately 15% of those occupations would be available to claimant. Additionally, he named the position of sales support, of which there were approximately 16,000 positions nationally and 300 statewide. He stated that approximately 50% of those positions were available to claimant. (Tr. 50).

In the second hypothetical, the ALJ asked the VE to assume a claimant who had a residual functional capacity to perform light work that did not require working overhead; that did not require climbing of ladders, ropes, or scaffolds; required only occasional climbing of ramps and stairs, with occasional balancing, stooping, kneeling, crouching, and crawling, and required only occasional fingering and reaching with the left arm. (Tr. 50-51). In response, Mr. Bordelon identified the same jobs, but said that he would reduce the sales support jobs to 40% and the weigher, measurer and checker positions to 10%. (Tr. 51).

For the third hypothetical, the ALJ asked the VE to assume a claimant who could perform light work with occasional postural limits; who could not work

11

overhead, and who could frequently finger, handle and reach with both arms. (Tr. 51). In response, Mr. Bordelon could not identify any jobs. (Tr. 52). When the ALJ asked whether any jobs would be available to a claimant who was physically unable to work eight hours a day, five days a week, the VE responded that there would not. (Tr. 52).

**(10) The ALJ's Findings are Entitled to Deference**. Claimant argues that: (1) the ALJ failed to accord proper weight to the opinion of the treating physicians, resulting in a failure to find her disabled pursuant to the Medical-Vocational Guidelines, and (2) alternatively, the ALJ erred in assessing claimant's residual functional capacity, resulting in an improper reliance upon the testimony of the vocational expert to find her not disabled at Step 5. Because I find that the ALJ erred in finding that claimant could perform light work which existed in significant numbers, I recommend that this case be **REMANDED** for further proceedings.

As to the first argument, claimant asserts that the ALJ improperly discounted the opinions of her treating physicians, Drs. Lindemann and Jolivette. (rec. doc. 10, p. 1). Instead, the ALJ gave more weight to the opinion of her treating neurologist, Dr. deAraujo. (Tr. 23).

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great

weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence." *Newton*, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).

In rejecting Drs. Lindemann's and Jolivette's opinions, the ALJ cited Dr. deAraujo's report in which he discharged her, noting that her neurological examination was normal. (Tr. 23, 236). However, Dr. deAraujo had released her to the care of Dr. Lindemann, to whom he had referred claimant for treatment of her post-surgical symptoms. (Tr. 236, 239). Additionally, Dr. deAraujo did not address claimant's residual functional capacity, but Drs. Lindemann and Jolivette did.

At claimant's last examination, Dr. Lindemann changed her work status to "permanently disabled due to her intractable pain with a history of posterior cervical decompression." (Tr. 242). This opinion is bolstered by that of Dr. Jolivette, who performed a residual functional capacity examination finding that claimant could not lift or carry more than 10 pounds; could sit for less than 6 hours in an 8-hour

13

workday; was limited as to pushing and pulling because of her cervical radiculopathy with cervical disc disease and acute and chronic neuropathic pain; could never climb, balance, kneel, crouch, crawl, or stoop; had limited ability to reach, handle, finger, or feel, and had environmental limitations because any uncomfortable stimulus aggravated her underlying neuropathic pain. (Tr. 250-53).

The opinions of both treating physicians reflect that claimant did not have the ability to perform light work as found by the ALJ. As Dr. deAraujo did not assess claimant's residual functional capacity, there is no evidence from an examining physician which contradicts those opinions. However, in all of the hypotheticals to the vocational expert, the ALJ assumed the ability to perform light work. (Tr. 48-52). This was error.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g). This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain vocational expert testimony based on claimant's residual functional capacity assessment by an examining physician. Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See,

14

*Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed this 5 day of September, 2005, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT:
DATE: 9-6-05
BY: gbr
TO: TLM
CMH